Richard R. KREIMER, Plaintiff,

v.

BUREAU OF POLICE FOR the TOWN OF MORRISTOWN, et al., Defendants.

No. 90–554(HLS).

United States District Court, D. New Jersey.

May 22, 1991.

Clifford W. Starrett, Schenk, Price, Smith & King, Morristown, N.J., for Morristown Library.

Bruce S. Rosen, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for Richard R. Kreimer.

Deborah A. Ellis, American Civil Liberties Union of New Jersey, Newark, N.J.

## OPINION

SAROKIN, District Judge.

A public library has enacted a regulation which is admittedly aimed at barring a particular homeless person from its premises because his presence and appearance are considered offensive to others. The danger in excluding anyone from a public building because their appearance or hygiene is obnoxious to others is self-evident. The danger becomes insidious if the conditions complained of are borne of poverty.

The public library is one of our great symbols of democracy. It is a living embodiment of the First Amendment because it includes voices of dissent. It tolerates that which is offensive. The library of today frequently provides not only access to books, newspapers, and magazines, but also to concerts, lectures, and exhibits. It is a source of fact and fiction.

One cannot dispute the right and obligation of the library trustees to assure that the library is used for the general purposes for which it is intended. Libraries cannot and should not be transformed into hotels

or kitchens, even for the needy. The public has the right to designate which of its institutions shall be utilized for particular purposes.

However, in establishing regulations for use, the conditions imposed must be specific, their purposes necessary, and their effects neutral. Likewise, enforcement cannot be left to the whim or personal vagaries of the persons in charge.

No one can dispute that matters of personal appearance and hygiene can reach a point where they interfere with the enjoyment of the facility by others. But one person's hay-fever is another person's ambrosia; jeans with holes represent inappropriate dress to some and high fashion to others. Thus, no matter how laudable and understandable the goals of the library may be, we cannot—we dare not—cross the threshold of barring persons from entering because of how they appear based upon the unfettered discretion of another.

Society has survived not banning books which it finds offensive from its libraries; it will survive not banning persons whom it likewise finds offensive from its libraries. The greatness of our country lies in tolerating speech with which we do not agree; that same toleration must extend to people, particularly where the cause of revulsion may be of our own making. If we wish to shield our eyes and noses from the homeless, we should revoke their condition, not their library cards.

*Background*

The court has been asked to resolve defendants' motion for summary judgment on the facial validity of the "Patron Policy" (hereinafter "policy") instituted by the Joint Free Public Library of Morristown and Morris Township, under which plaintiff was ejected and subsequently excluded from the library. This motion for summary judgment on the facial validity of the library policy does not address or attempt to resolve whether defendants acted within that policy on the occasions upon which they excluded plaintiff from the library, nor does it pertain to plaintiff's conduct in

any way. Nevertheless, on this motion, defendants request "a mandatory injunction [directing] that plaintiff shall leave the Library premises when so directed by the executive director of the Library or her authorized assistant." Def. Reply Brief at 16.

Plaintiff has cross-moved for summary judgment, arguing that the library policy is facially invalid. Should the court find in plaintiff's favor on this cross-motion, plaintiff requests that the court enter 1) a declaratory judgment that the library policy violates plaintiff's rights under the New Jersey and United States Constitutions; 2) a preliminary and permanent injunction barring enforcement of Patron Policy paragraphs 1, 5, 9, and the final two unnumbered paragraphs; and 3) an injunction barring promulgation of any future library policy designed to restrict plaintiff's or other homeless persons' access to the library. Plt. Brief at 2–3. The American Civil Liberties Union of New Jersey ("ACLU"), in its capacity as an *amicus curiae*, has made submissions in support of plaintiff's position.

Plaintiff, a resident of Morristown, is a homeless individual whose access to showers and laundry facilities is severely curtailed by his homeless status. Kreimer Cert. at ¶¶ 1, 6. In the underlying action, plaintiff alleges that the library policies[1] governing access to the library violate his rights guaranteed under state and federal law. He seeks a declaration that the policy is invalid, an injunction against its enforcement, and the assessment of damages against several municipal employees and agencies for excluding plaintiff from the library on the basis of the policy.

On May 16, 1989, in specific response to the "problem behavior" of some library patrons (Def. Brief at 3), the library Board of Trustees adopted to following written policy:

1. Patrons shall be engaged in normal activities associated with the use of a public library while in the building. Pa-

---

1. As alleged in plaintiff's Amended Complaint, plaintiff challenges the two different library policies, described *infra*, which were in effect during the relevant time period.

trons not engaged in reading, studying, or using library materials may be asked to leave the building. Loitering will not be tolerated.

....

5. Patrons shall respect the rights of other patrons and shall not annoy others through noisy or boisterous activities, by unnecessary staring, by following another person through the building, by playing walkmans or other audio equipment so that others can hear it, by singing or talking to oneself or any other behavior which may reasonably result in the disturbance of other persons.

....

9. Patron dress and personal hygiene shall conform to the standard of community public places. This shall include the repair or cleanliness of garments.

Any patron not abiding by these or other rules and regulations of the Library, may be asked to leave the Library premises. Library employees shall contact the Morristown Police if deemed advisable.

Any patron who violates the Library rules and regulations may be denied the privilege of access to the Library by the Library Board of Trustees, on recommendation of the Library Director.

Rice Cert., Exh. B. Defendants freely admit that they designed these regulations to curb the specific behavior of plaintiff. *See* Def. Reply Brief at 12.

Shortly after the library announced this policy, a staff attorney of *amicus* the ACLU of New Jersey contacted counsel for the library and expressed the belief that the policy's prohibition on "loitering" was unconstitutionally vague. In addition, the ACLU suggested that the policy as written gave to the library staff excessive discretion to enforce the policy. Rice Cert., Exh. C. According to defendants, the library Director and Board of Trustees discussed the issue with their counsel, who advised that although in his opinion, the policy was

not unconstitutionally vague, the library might consider clarifying the policy.

In response, the following revised policy was adopted on July 25, 1989:

1. Patrons shall be engaged in activities associated with the use of a public library while in the building. Patrons not engaged in reading, studying, or using library materials shall be asked to leave the building.

*Id.*, Exh. E. Thus, revised paragraph 1 reflects three changes from the previous policy: 1) there is no longer any reference to "normal" activities; 2) qualifying patrons "shall" be asked to leave, instead of "may" be asked to leave; and 3) there is no longer any reference to "loitering." In addition, the revised policy provides as follows (newly added words and phrases are underlined, and omitted words and phrases appear in brackets):

5. Patrons shall respect the rights of other patrons and shall not *harass or* annoy others through noisy or boisterous activities, by [unnecessary] staring *at another with the intent to annoy that person,* by following another person about the building *with the intent to annoy that person,* by playing walkmans or other audio equipment so that others can hear it, by singing or talking to oneself or any other behavior which may reasonably result in the disturbance of other persons.

6. *Patrons shall not improperly interfere with the use of the library by other patrons, or improperly interfere with library employees' performance of their duties.*[2]

....

9. *Patrons shall not be permitted to enter the building without a shirt or other covering of their upper bodies or without shoes or other footwear. Patrons whose bodily hygiene is so offensive as to constitute a nuisance to other persons shall be required to leave the building.*

---

**2.** The court notes that plaintiff does not challenge this newly added paragraph of the library policy.

Any patron not abiding by these or other rules and regulations of the library *shall* [formerly may] be asked to leave the library premises. Library employees shall contact the Morristown Police if deemed advisable.

Any patron who violates the library rules and regulations *shall* [formerly may] be denied the privilege of access to the library by the library Board of Trustees, on recommendation of the Library Director. *Any aggrieved patron may have the decision reviewed by the Board of Trustees but only if the patron has complied with the directive of the Library Director.*

*Id.* The library's counsel approved the policy, and the Director instructed the library staff to enforce the policy. Defendants maintain that "[a]ll the librarians' actions at issue in this case were taken pursuant to the Library Policy, in both its written and unwritten forms." Def. Brief at 5.[3] By letter dated September 19, 1989, a staff attorney of the ACLU of New Jersey expressed continued concern that the revised policy afforded library staff excessive enforcement discretion which could inflict a discriminatory impact against homeless persons and, more generally, "might allow one class of persons to remain and require one class to leave the premises." *Id.*, Exh. F.

The revised policy adopted on July 25, 1989, remains in effect to this date.

*Discussion*

This court can only grant summary judgment if there are no genuine issues of material fact and, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 84 (3d Cir.1987). Because the parties' cross-motions for summary judgment only concern the facial validity of the library policies and not the

facts of plaintiff's underlying complaint, the single issue raised in these cross-motions—i.e., whether the library regulations are facially valid—is particularly suited for immediate resolution via summary judgment.

I. The Library Policy Violates the First Amendment

The First Amendment to the United States Constitution provides: "Congress shall make no law ... abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble, and to petition Government for a redress of grievances." The Amendment applies to the states under the Fourteenth Amendment.

The New Jersey Legislature vests the public library Board of Trustees with the power to make and to enforce "proper rules and regulations for the government of the library and generally do all things necessary and proper to the establishment and maintenance" of the library. N.J.S.A. 40:54–12; N.J.S.A. 40:54–29.13. The instant policies were instituted and enforced pursuant to this vested authority.

As a preliminary matter, the court must determine whether the library regulations implicate the First Amendment, thereby triggering a stricter standard of review.

A. *Applicability of the First Amendment*

■ The First Amendment protects the right to express ideas and the right to receive ideas; it protects the right of the speaker and the listener, the writer and the reader. The right to receive ideas is a natural corollary to the right to speak. "The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read." *Griswold v. State of Connecticut*, 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965), *citing Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed.

---

**3.** Defendants make no attempt to explain just what the policy's "unwritten form" may be, nor

do they identify to what that phrase refers.

1313 (1943) (ordinance prohibiting distribution of handbills door to door unconstitutional as applied; "the First Amendment ... freedom embraces the right to distribute literature ... and necessarily protects the right to receive it"). *See also Board of Education, Island Trees Union Free School District No. 26 v. Pico,* 457 U.S. 853, 866–67, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982) (plurality opinion) ("the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them.... More importantly, the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights such as speech, press, and political freedom") (emphasis in original); *Stanley v. Georgia,* 394 U.S. 557, 564–66, 89 S.Ct. 1243, 1247–49, 22 L.Ed.2d 542 (1969) (First Amendment right to receive information and ideas includes right of private possession of obscene materials); *Lamont v. Postmaster General of the United States,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (statute directing Post Office to inspect foreign mail unconstitutional); *id.* at 308, 85 S.Ct. at 1497 (Brennan, J., concurring) ("the right to receive publications is ... a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers"); *Kleindienst v. Mandel,* 408 U.S. 753, 762–65, 92 S.Ct. 2576, 2581–83, 33 L.Ed.2d 683 (1972) (right of professors to hear foreign academics); *Red Lion Broadcasting Co. v. Federal Communications Commission,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) ("It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount.... It is the right of the public to receive suitable access to social, political, aesthetic, moral, and other ideas and experiences which is crucial here"). Accordingly, the library policy at issue in this case, which conditions access to public reading materials, necessarily falls within the purview of First Amendment jurisprudence.

## B. *The Standard of Review*

 In *Perry Education Assn. v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court developed a standard by which to examine regulations under the First Amendment. The Court delineated three types of fora: a traditional public forum, a designated or limited public forum, and a nonpublic forum. In the first two categories—"[i]n places which by long tradition or by government fiat have been devoted to assembly and debate"—the rights of the state "to limit expressive activity are sharply circumscribed." *Id.* at 45, 103 S.Ct. at 954. In both of these categories, the government may impose reasonable time, place, and manner restrictions which are content-neutral, are narrowly tailored to serve a *significant* government interest, and leave open ample alternative channels of communication. *Id.* See also *Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972) ("The right to use a public place for expressive activity may be restricted only for weighty reasons").[4] The third category, nonpublic fora, are governed by a different standard: "In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry,* 460 U.S. at 46, 103 S.Ct. at 955.

The *Perry* Court described the first category, traditional public fora, as follows:

At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communi-

4. The Court also held that content-based exclusions of expressive activity in traditional and designated public fora must be necessary to achieve a *compelling* state interest, and must be narrowly drawn to serve that end. The parties in this action agree that no content-based restrictions are at issue in this case.

cating thoughts between citizens, and discussing public questions."

*Id.* at 45, 103 S.Ct. at 954–55 (citations omitted). The second category, designated public fora, "consists of public property which the State has opened for use by the public as a place for expressive activity." *Id.*

A public library is, by definition, "public property which the State has opened for use by the public as a place for expressive activity"—in this case, the First Amendment activities of expressing and receiving written ideas. As the Third Circuit stated in *International Society for Krishna Consciousness, Inc., v. New Jersey Sports and Exposition Authority*, 691 F.2d 155, 160 (3d Cir.1982), "[t]he primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used." The intended and actual use of a library is as a place for the communication of the written word. A public library is a designated public forum, and defendants have conceded as much. *See* Def. Brief at 19, Reply Brief at 6.[5]

Moreover, apart from their governmental designation as a public forum, public libraries have traditionally functioned as a public forum for the communication of written ideas. Thus, a public library is not only a designated public forum, but also a "quintessential,"[6] "traditional" public forum whose accessibility affects the bedrock of our democratic system. A place where ideas are communicated freely through the written word is as integral to a democracy and to First Amendment rights as an available public space where citizens can communicate their ideas through the spoken word.

When considered as either a designated or a traditional public forum, the same standard of review applies. Government restrictions on access to a designated or traditional public forum must reasonably serve a significant state interest, the re-

strictions must be narrowly tailored to serve that interest, and the government must leave open alternative channels of communication. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. Defendants' argument that the court should afford the policy a presumption of reasonableness and thus defer to the library Board (Def. Brief at 19–26) is entirely inconsistent with the applicable law.

C. *The Library Policy Is Not a Reasonable Time, Place, and Manner Restriction Which Is Narrowly Tailored to Serve a Significant Government Interest*

■ The library policy in the instant case is not narrowly tailored to serve the stated significant government interest, nor does the policy leave open any alternative means of access to publicly provided reading materials for patrons who may be "denied the privilege of access to the library" under the policy.

Defendants assert that the library policy serves the significant government interest of fostering a quiet and orderly atmosphere in the library conducive to every patron's exercise of their constitutionally protected interest in receiving and reading written communications. Def. Brief at 9–10. As the preamble of the policy states:

> In order to allow all patrons of the Joint Free Public Library of Morristown and Morris Township to use its facilities to the maximum extent possible during its regularly scheduled hours, the Library Board of Trustees has adopted the following rules and regulations.

Rice Cert., Exh. E. This stated purpose is indeed a significant and valid interest in a library, a quiet place for reading and contemplation. *See Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966). The Supreme Court has consistently recognized the necessity of regulations designed to secure a quiet and peaceful

---

**5.** Defendants argue that the state was not required to open the library in the first instance. Def. Reply Brief at 4. As the Court in *Perry* noted, however, "the Constitution forbids a State to enforce certain exclusions from a fo-rum generally open to the public even if it was not required to create the forum in the first place." 460 U.S. at 45, 103 S.Ct. at 955.

**6.** *See Perry,* 460 U.S. at 45, 103 S.Ct. at 954.

environment. *See Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980) ("the essence of time, place, or manner regulation lies in the recognition that various methods of speech, regardless of their content, may frustrate legitimate government goals. No matter what its message, a roving sound truck that blares at 2 a.m. disturbs neighborhood tranquility").

However, the Court has also consistently held that government must limit time, place, and manner restrictions of a public forum to prohibitions of activity which actually and materially interferes with the peaceful and orderly management of the public space. *See Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 509, 89 S.Ct. 733, 737–38, 21 L.Ed.2d 731 (1969) (invalidating school ban of silent expressive protest unless such expression materially and substantially interferes with school activities); *Intern. Soc. for Krishna,* 691 F.2d at 161 (limiting regulations of public forum to restrictions of activities "basically *incompatible* with the ... character and function" of the place), *quoting Heffron v. ISKCON, Inc.,* 452 U.S. 640, 650–51, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981) (emphasis added). When subjected to heightened scrutiny, regulations not designed specifically to address disruptive activity are not "reasonable" time, place, and manner restrictions, since they are not responsive to the government's stated purpose of curtailing disruptions, nor are they "narrowly tailored" to serve that purpose.[7]

*Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), is just one of the numerous cases in which the Supreme Court has insisted that time,

place, and manner restrictions aimed at furthering the government's interest in the peaceful and orderly use of a public forum must incorporate an actual disruption standard if the government intends to deny access to the forum. In *Grayned,* the Court upheld a school-zone, anti-noise ordinance which prohibited "the making of any noise which disturbs or tends to disturb the peace or good order of such school session or class thereof...." *Id.* at 108, 92 S.Ct. at 2298. The Court indicated that although it was "troubled" by the vagueness of a prohibition curtailing noise which "tends to disturb," the Court upheld the ordinance because the State Supreme Court "would interpret the Rockford ordinance to prohibit only *actual* or *imminent* interference with the 'peace or good order' of the school." *Id.* at 111–12, 92 S.Ct. at 2301. The Court clarified this actual disturbance standard by distinguishing the *Grayned* ordinance from those regulations which the Court invalidated in *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), and *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), under which persons who "annoyed" or "disquieted" others could be punished without any indication or threat of actual or imminent disruption. In contrast, the *Grayned* ordinance required "a demonstrated interference with school activities." *Id.* at 113–14, 92 S.Ct. at 2302.

Unlike the *Grayned* ordinance, the library patron policy at issue in this case does not limit itself to prohibitions of actual library disturbance. According to paragraphs 5 and 9 of the policy, library patrons are excluded from the facility if their behavior "annoys" another person or if their "bodily hygiene is so offensive as to constitute a nuisance to other persons."

---

**7.** It should be noted that time, place, and manner restrictions premised on a material and actual disruption standard do not allow for a "heckler's veto." Persons who actually create disturbances—as opposed to speakers or readers who inspire the wrath of others—are those properly curtailed under a "material and substantial disruption" standard. *See U.S. v. Eichman,* — U.S. —, 110 S.Ct. 2404, 2410, 110 L.Ed.2d 287 (1990) (holding Flag Protection Act violative of the First Amendment); *Terminiello*

*v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949) (free speech may not be curtailed unless it provokes "a serious substantive evil that rises far above public inconvenience, annoyance, or unrest," since free speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.... There is no room under our Constitution for a more restrictive view").

The policy does not condition exclusion upon an actual or imminent disruption or disturbance as a result of such behavior or hygiene, and hence, the policy does not reasonably effectuate its stated goal of preserving the good order of the library.

According to paragraph 1 of the policy, patrons who sit quietly and peacefully in the library but who are not actively "using library materials shall be asked to leave the building." This restriction has no relation to the library's stated purpose of preserving the peace and quiet of the facility for the benefit of all patrons. Thus, the court concludes that paragraphs 1, 5, and 9 of the library policy are not reasonable time, place, or manner restrictions which serve the state's significant interest in maintaining the library atmosphere at a level conducive to all patrons' use of the facility. As such, these paragraphs violate the First Amendment of the United States Constitution.

█ In addition, the last two unnumbered paragraphs violate the First Amendment because they are not narrowly tailored to serve the stated government interest in maintaining a quiet and peaceful atmosphere. These paragraphs provide that any patron not abiding by the terms of the policy shall be asked to leave and may be permanently "denied the privilege of access to the library," save some undefined and undetailed "appeal" process to the library Board of Trustees.[8] Denying a patron all access to library materials leaves no "alternative channels of communication" available to those without private means of access to the quantity and diversity of written communications contained in a library. Such a drastic exclusion forecloses all comparable access to these materials for most people, especially the poor and homeless who are without the funds to purchase even a single newspaper. Without any requirement of evidence or suggestion that the excluded patron will be disruptive on a later occasion, the final two, unnumbered paragraphs of the library policy

allow the library to permanently exclude library patrons. Thus, paragraphs 1, 5, 9, and the final two, unnumbered paragraphs of the library policy are not reasonable time, place, and manner restrictions, are not "narrowly tailored" to serve the stated purpose of the regulations, and do not provide for alternative channels of communication, thereby violating the First Amendment to the United States Constitution.

## II. The Library Policy Is Unconstitutionally Overbroad

In addition to failing on First Amendment time, place, and manner grounds, the library policy fails on overbreadth grounds as well. As the Supreme Court has stated:

> In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge....

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). The Court further explained:

> In making that determination [whether the enactment reaches constitutionally protected conduct], a court should evaluate the ambiguous as well as the unambiguous scope of the enactment. To this extent, the vagueness of a law affects overbreadth analysis. The court has long recognized that ambiguous meanings cause citizens to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked."

*Id.* at 494 n. 6, 102 S.Ct. at 1191 n. 6 (citations omitted). As evidenced by this discussion, overbreadth and vagueness analyses are often conflated. However, as opposed to the vagueness doctrine's concern with notice and arbitrary enforcement (*see infra*, part III), the overbreadth doctrine responds to the distinct concern that

---

8. At oral argument, counsel for the library conceded that patrons can be permanently barred

from the library pursuant to the policy.

government regulations may be so vague and indefinite that they include the possibility of punishment for constitutional activity. *Cox v. Louisiana,* 379 U.S. 536, 552, 85 S.Ct. 453, 463, 13 L.Ed.2d 471 (1965).

■ Thus, contrary to defendant's repeated emphasis on plaintiff's own behavior rather than on the regulations themselves,

> [u]nder the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face "because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503 [105 S.Ct. 2794, 2801–02, 86 L.Ed.2d 394] (1985).

*Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987). The fact that a certain regulation may also curb unprotected activity is irrelevant to the overbreadth challenge given the "chilling effect" which the regulations might have on protected activity. *See Doe v. University of Michigan,* 721 F.Supp. 852, 864 (E.D.Mich.1989).

However, a statute or regulation is not invalid on overbreadth grounds simply because the court can imagine the most remote hypothetical which tangentially implicates First Amendment activity.

> A statute may be invalidated on its face ... only if the overbreadth is "substantial." *Houston v. Hill,* [482 U.S. 451], 458–459 [107 S.Ct. 2502, 2507–08, 96 L.Ed.2d 398 (1987)]; *New York v. Ferber,* 458 U.S. 747, 769 [102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113] (1982); *Broadrick v. Oklahoma,* 413 U.S. 601, 615 [93 S.Ct. 2908, 2917, 37 L.Ed.2d 830] (1973). The requirement that the overbreadth be substantial arose from our recognition that application of the overbreadth doctrine is, "manifestly strong medicine," *Broadrick v. Oklahoma, supra,* at 613 [93 S.Ct. at 2916], and that "there must be a realistic danger that the statute itself

will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801 [104 S.Ct. 2118, 2126, 80 L.Ed.2d 772] (1984). *Jews for Jesus,* 482 U.S. at 574, 107 S.Ct. at 2572 (invalidating airport regulation prohibiting all "First Amendment activities" unrelated to airport activity). Moreover, the court must make its best effort to excise the overbroad aspects of the statute and leave surviving portions of the statute intact. *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 502–05, 105 S.Ct. 2794, 2801–02, 86 L.Ed.2d 394 (1985).

■ Under the foregoing analytical framework, as explicated by the numerous cases in which the Supreme Court has invalidated similar government enactments on overbreadth grounds, the court concludes that paragraphs 1 and 5 of the current library policy are unconstitutionally overbroad. Paragraph 1 provides:

> Patrons shall be engaged in activities associated with the use of a public library while in the building. Patrons not engaged in reading, studying, or using library materials shall be asked to leave the building.

This provision is clearly overbroad given the type of constitutional activity explicitly protected in *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966). In *Brown,* five black men entered a public library for the purpose of peaceably protesting the denial of their right to equal treatment in a public facility. A librarian responded to the men's request for a particular book (which the library did not have), after which the men "sat and stood in the room, quietly, as monuments of protest against the segregation of the library." 383 U.S. at 139, 86 S.Ct. at 722. There was no one in the library except for the librarians. 383 U.S. at 140, 86 S.Ct. at 723. A librarian asked the men to leave, and after 10 or 15 minutes, the sheriff arrested the men pursuant to the Louisiana breach of peace statute, under which the men were convicted of congregating in a

public building and failing to disperse when ordered to do so "with intent to provoke a breach of the. peace, or under circumstances such that a breach of the peace may be occasioned thereby." 383 U.S. at 138, 86 S.Ct. at 722.

The Supreme Court reversed the convictions, noting that the Court had previously held that the Louisiana breach of peace statute was unconstitutional under the vagueness and overbreadth doctrines. 383 U.S. at 135, 86 S.Ct. at 720. *See Cox v. Louisiana,* 379 U.S. at 551–552, 85 S.Ct. at 462–63 (holding Louisiana breach of peace statute unconstitutional "in that it sweeps within its broad scope activities that are constitutionally protected free speech and assembly"). The State had argued that the men were "loafing," "making a nuisance of themselves," and "staring vacantly, . . . enough to unnerve a woman in the situation [the librarian] was in," 383 U.S. at 140, 86 S.Ct. at 723, all of which are similar to the complaints lodged against plaintiff in this case. The Supreme Court rejected the State's protests for sympathy, holding that First Amendment "rights are not confined to verbal expression. They embrace appropriate types of action which certainly include the right in a peaceable and orderly manner to protest by silent and reproachful presence, in a place where the protestant has every right to be." 383 U.S. at 142, 86 S.Ct. at 724.

The fact that Mr. Kreimer may not have intended to engage in the kind of noble protest that the *Brown* petitioners were engaged in has no relevance for purposes of this facial overbreadth challenge. Under paragraph 1 of the library policy, the *Brown* protesters would be prevented from engaging in their constitutionally protected protest were they to stage the same silent vigil in the Morristown library. Indeed, the library policy would prevent and chill *any* silent, peaceful protest of the library similar in manner and scope to the *Brown* protest. This is just one example which demonstrates that paragraph 1 of the library policy is substantially and unconstitutionally overbroad.[9]

Moreover, the library has not suggested or identified any significant government interest which requires the stringent restriction contained in paragraph 1 of the policy. As developed earlier in this court's discussion of the library policy in terms of the First Amendment time, place, and manner doctrine, *supra* part I, the library can institute regulations prohibiting disruptions that interfere with the rights of all patrons to receive information. But paragraph 1 does not make library access contingent on actual disruption. In case after case, the Supreme Court has invalidated on overbreadth grounds government regulations which propose to address the government's valid concern for an orderly environment but which do not impose an actual disruption requirement. *See Cox,* 379 U.S. at 551–52, 85 S.Ct. at 462–63; *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 509, 89 S.Ct. 733, 737–38, 21 L.Ed.2d 731 (1969) (ban on silent protest in public school where no evidence that expression causes "material and substantial disruption" violates First Amendment). *See also Grayned,* 408 U.S. at 110–12, 92 S.Ct. at 2300–01 (upholding antinoise ordinance in school zone against overbreadth challenge where state courts interpret ordinance as imposing actual disruption standard).

■ Similarly, paragraph 5 of the library policy is unconstitutionally overbroad be-

9. The court's public forum analysis, *supra* part I, focuses on the library's status as a public forum in terms of the First Amendment interest in receiving information rather than in terms of individuals' interest in speaking or other expressive conduct. However, if the only protected First Amendment activity in a public library were the patron's right to receive ideas, then the library could proceed to prohibit all expressive First Amendment activity by library patrons, such as the wearing of political campaign buttons or black armbands, in what would effectively be a "First Amendment Free Zone." It is beyond dispute that such conditions would be unconstitutionally overbroad, even in a nonpublic forum. *See Jews for Jesus,* 482 U.S. at 574–75, 107 S.Ct. at 2572. Rather, as discussed in *Brown,* 383 U.S. 131, 86 S.Ct. 719, there are certain constitutionally protected activities, such as a silent protest of library policies ·staged inside a library, which cannot be impinged upon absent the strongest of governmental interests.

cause, in conjunction with the final two, unnumbered paragraphs, it excludes patrons from the library for reasons such as silent "staring at another with the intent to annoy that person." This regulation is no different from the regulations at issue in the above cited cases, which proposed to exclude individuals from public spaces for activity (such as silent staring) which "annoyed" people but which did not actually cause or threaten a disruption. *See Brown*, 383 U.S. 131, 86 S.Ct. 719; *Cox*, 379 U.S. 536, 85 S.Ct. 453. In addition, the library's "catch-all" phrase which prohibits "any other behavior which may reasonably result in the disturbance of other persons" is dramatically overbroad given that the policy does not define "disturbance" as a material disruption but, to the contrary, provides that mere "annoyance" of another person, without actual disruption, constitutes a "disturbance." Conditioning library access—access to a place which by definition implies that protected First Amendment activity is taking place—based on the state of mind or presence of the patron substantially and unconstitutionally impinges on constitutionally protected activity.

■ However, the court concludes that the portion of paragraph 5 which prohibits the "playing of walkmans or other audio equipment so that others can hear it" is a narrowly drawn prohibition of specific, identifiable conduct which actually, materially interferes with the government's significant interest in securing the ability of other patrons to receive information. Such a disturbance does not comport with the need for quiet attendant in a library setting. Accordingly, the court concludes that, except for the provision in paragraph 5 which prohibits the audible use of audio equipment, paragraphs 1 and 5 of the library policy are substantially overbroad in violation of the First Amendment.

### III. The Library Policy Is Unconstitutionally Vague

■ The Supreme Court has identified three reasons supporting the "basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined": 1) a vague law may "trap the innocent" by failing to provide fair warning such that a person of ordinary intelligence would have a reasonable opportunity to know what was prohibited; 2) a vague law without explicit standards allows for arbitrary and discriminatory enforcement by impermissibly delegating decisions on basic policy matters to government officials who resolve the matters on an *ad hoc* and subjective basis; and 3) a vague law which touches on First Amendment freedoms "chills" free expression and inhibits the exercise of First Amendment rights. *Grayned*, 408 U.S. at 108–09; 92 S.Ct. at 2298–99 (1972).

> As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. [citations omitted.] Although the doctrine focuses both on actual notice to citizens and on arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine— the requirement that a legislature establish minimal guidelines to govern law enforcement." *Smith [v. Goguen]*, 415 U.S. [566] 574 [94 S.Ct. 1242, 1247–48, 39 L.Ed.2d 605 (1974)].

*Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Because "vagueness" is a due process problem, courts can invalidate government enactments even if no constitutional right is at stake. *See Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

Defendants protest that the library policy is not subject to a vagueness challenge because the library policy is not a penal statute. Def. Brief at 14. However, defendants concede that failure to comply with the policy results in criminal trespass, *see* Def. Brief at 15, and the second to last paragraph of the policy incorporates the

imminent threat of police involvement, presumably to arrest uncooperative patrons pursuant to the criminal trespass law.[10] Defendants' argument that no criminal sanction is involved since challenged patrons need only leave the library to avoid arrest is a classic example of circular and confused logic: *any* potential criminal defendant may avoid penal sanction if she refrains from engaging in the criminalized conduct. Moreover, in *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) (*quoting N.A.A. C.P. v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963)), the Court invalidated on vagueness grounds a loyalty oath requirement for employment as a state teacher, stating: "[W]e emphasize once again that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'" The court concludes that plaintiff's vagueness challenge to the library policy is properly presented.

Paragraph 1 of the library policy purports to exclude all patrons not engaged in "library related activities." At oral argument, counsel for defendants conceded that "quiet contemplation" was a "library related activity," although apparently not if the patron did not use library reading material within a short time prior to the contemplation. Yet counsel also conceded that a patron may use the library as a quiet place in which, for example, to balance a checkbook. Indeed, counsel's attempt to clarify the regulation via examples provided at oral argument (as opposed to clues contained in the regulations themselves) only further confused the meaning and scope of paragraph 1. Counsel apparently relies on the proposition that "[t]he regulation of irregular patron behavior represents precisely the kind of governmental enforcement that cannot be more precisely addressed." Def. Brief at 14. This admitted inability to clarify the policy only confirms what is evident by even the most lenient of inquiries: Paragraph 1 is hopelessly vague.

According to paragraph 5 of the library policy, any patron who stares at or follows another person "with the intent to annoy that person" may be excluded from the library. Paragraph 9 of the policy provides that "[p]atrons whose bodily hygiene is so offensive as to constitute a nuisance to other persons shall be required to leave the building." There is little doubt that both of these provisions are unconstitutionally vague as well.

*Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), is directly on point. In that case, the Supreme Court invalidated an ordinance prohibiting the assembly of three or more persons in a public space who "conduct themselves in a manner annoying to persons passing by" as unconstitutionally vague. The Court struggled with the meaning of the "annoyance" standard, the discussion of which is directly applicable to the library policy's "annoyance" and "offensiveness" standards. As the Supreme Court stated in *Coates:*

> In our opinion this ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct.
>
> Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, "men of common intelligence must necessarily guess at its meaning." *Connally v. General Construction Co.*, 269 U.S. 385, 391 [46 S.Ct. 126, 127–28, 70 L.Ed. 322].
>
> It is said that the ordinance is broad enough to encompass many types of conduct clearly within the city's constitutional power to prohibit. And so, indeed, it is. The city is free to prevent people

---

**10.** Under N.J.S.A. 2C:18–3, a person is subject to prosecution for criminal trespass "if, knowing that he [or she] is not licensed or privileged to do so, [a person] enters or remains in any place as to which notice against the trespass is given."

from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct. It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited. *Gregory v. Chicago*, 394 U.S. 111, 118, 124–125 [89 S.Ct. 946, 950, 953–54, 22 L.Ed.2d 134] (BLACK, J., concurring). It cannot constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed.

402 U.S. at 614, 91 S.Ct. at 1688. Similarly, the library cannot condition access on behavior, appearance, or hygiene whose appropriateness "entirely depends upon whether or not a [librarian] is annoyed." Nor is the library policy saved by the condition that the patron have the "intent" to "annoy;" that condition made no difference in the *Brown* case. 383 U.S. 131, 86 S.Ct. 719. Thus, the library policy's use of the "annoyance" standard is "perfectly vague" [11] and unconstitutional. *See Grayned*, 408 U.S. at 113, 92 S.Ct. at 2301 (noting that *Coates* decision based on vagueness of "annoyance" standard).[12]

The "offensiveness" standard of the paragraph 9 "smell" test is also "perfectly vague" and is especially susceptible to arbitrary and discriminatory enforcement. There is no indication that the library policy's provision banning hygiene posing a "nuisance" to others refers to the standards for establishing common law nuisance, nor does the policy give notice to patrons as to what those standards are.

To the contrary, the only indication within the policy as to what constitutes a "nuisance" is hygiene that "annoys" others. This hygiene aspect of the library policy is no different from an "ugly rule," whereby the library staff could eject patrons whose physical appearance caused others distress.[13] The policy neither contains nor refers to identifiable standards, thereby failing to provide adequate notice to actual or potential library patrons. At the same time, the policy affords the library staff and police excessive discretion in its enforcement.

Accordingly, the court concludes that paragraphs 1, 5, and 9 of the current library policy are unconstitutionally vague.

## IV. The Library Policy Conditions Library Access on Unconstitutional Distinctions Between Patrons

As discussed *supra*, the First Amendment prohibits the government from imposing time, place, and manner restrictions which unreasonably condition access to a public forum. Additionally, the constitutional doctrine of overbreadth prohibits the government from instituting an enactment which penalizes and/or chills a substantial amount of constitutionally protected conduct. Moreover, the due process clause of the Fourteenth Amendment prohibits the government from imposing a vague standard of conduct because of the possibility that government officials can enforce uncertain standards in an arbitrary and discriminatory manner. The noted provisions of the library policy are unconstitutional for all of these reasons.

---

**11.** Tribe, *American Constitutional Law,* 720–21 (1978) (coining phrase "perfectly vague").

**12.** In addition to *Coates,* there are numerous cases in which substantially similar language has been held to be unconstitutionally vague. For example, in *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), the Supreme Court invalidated a statute defining criminal "breach of peace" as "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, [and] to disquiet." The Court held that the statute was unconstitutionally vague and that it encouraged arbitrary enforcement by government officials.

**13.** At oral argument, defendants' counsel conceded that such a rule would be unconstitutional, but attempted to distinguish the library's "smell test" by noting that under the "ugly rule," distressed patrons could simply avert their eyes. Similarly, the patrons and staff who do not appreciate the perfume, cologne, and other odors of certain patrons could relocate their seats. The court recognizes the difficulties in establishing standards for a "smell test," but those difficulties do not make vagueness permissible.

In addition, the Due Process clause and the Equal Protection clause of the Fourteenth Amendment, coupled with the First Amendment rights of free assembly and association, prohibit the government from impinging upon individual liberty in an arbitrary and discriminatory manner without cause, justification, or reason. This is a different type of due process violation from vagueness; it requires a constitutional standard of fairness, such that the government cannot "make a crime out of what under the Constitution cannot be a crime." *Coates,* 402 U.S. at 616, 91 S.Ct. at 1689. It is beyond dispute that the government may not penalize or afford different, discriminatory treatment to a disfavored, disliked individual or class of individuals.

> Our decisions establish that mere public intolerance or animosity cannot be the basis for the abridgement of these constitutional freedoms.... The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be "annoying" to some people. If this were not the rule, the right of the people to gather in public places for social or political purposes would be continually subject to summary suspension through the good-faith enforcement of a prohibition against annoying conduct.

*Id.* at 615, 91 S.Ct. at 1689 (citations omitted). *See also O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975) (government may not "fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different.... Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty"). And, as the Court wrote in *Brown v. Louisiana,*

> A State or its instrumentality may, of course, regulate the use of its libraries or other public facilities. But it must do so in a reasonable and nondiscriminatory manner, equally applicable to all and administered with equality to all. It may not do so as to some and not as to all.... And it may not invoke regulations as to

use—whether they are *ad hoc* or general—as a pretext for pursuing those engaged in lawful, constitutionally protected exercise of their fundamental rights....

*Brown,* 383 U.S. at 143, 86 S.Ct. at 724 (citations omitted).

Paragraph 9 of the library policy focuses on the "hygiene" of a person and makes personal attributes such as appearance, smell, and manner of cleanliness determinative factors in the library staff's enforcement of the policy. Because the library policy's prohibition on offensive hygiene is in no way restricted to instances of actual, material disruptions which are incompatible with the library's function, *Grayned,* 408 U.S. 104, 92 S.Ct. 2294, the restriction impinges upon individual liberty and sanctions that which may not be sanctioned merely on the basis of "annoyance." The "smell test" contained in paragraph 9 is unconstitutional for this reason.

Moreover, defendants freely admit that paragraphs 1, 5, and 9 of the policy were designed with the explicit intention of restricting plaintiff's (and other homeless persons') access to the library. Def. Reply Brief at 12. The state may not exclude individuals from this public forum based merely on the identity of the library patron; the library policy of excluding patrons that are "offensive" to others is a reader-based restriction, analogous to prohibited speaker-based restrictions. In this case, the restriction is not because of the reader's views, but because of plaintiff's other personal attributes which the library staff finds "annoying." *See Niemotko v. Maryland,* 340 U.S. 268, 272, 71 S.Ct. 328, 328, 95 L.Ed. 280 (1951) ("[t]he conclusion is inescapable that the use of the park was denied because of the City Council's *dislike for* or disagreement with the Jehovah's Witnesses or their views") (emphasis added); *see also Perry,* 460 U.S. at 49, 103 S.Ct. at 957 (while distinctions "on the basis of subject matter and speaker identity ... may be impermissible" in public fora, such distinctions in non-public fora may be allowed).

■ The library's effort via the patron policy to exclude patrons such as plaintiff, i.e., homeless persons who may potentially use the library as temporary shelter from the elements, is also incompatible with the equal protection clause. Under *Papachristou v. City of Jacksonville,* 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972), generalized vagrancy statutes are unconstitutional:

> Those generally implicated by the imprecise terms of the ordinance—poor people, nonconformists, dissenters, idlers—may be required to comport themselves according to the lifestyle deemed appropriate by the Jacksonville police and courts.... It results in a regime in which the poor and unpopular are permitted "to stand on a public sidewalk ... only at the whim of any police officer." (citations omitted).

*See also Edwards v. California,* 314 U.S. 160, 177, 62 S.Ct. 164, 168–69, 86 L.Ed. 119 (1941) (invalidating California prohibition on transport of vagrants into state: "[W]e do not think that it will now be seriously contended that because a person is without employment and without funds he constitutes a 'moral pestilence' "). At oral argument, counsel for the library defended the need to exclude the homeless from the library based on the library's fear of liability should a homeless person "molest" a child while wandering through the stacks. Like the legislature in *Edwards,* the library suffers from the same discriminatory assumption that poverty is a proxy for "moral pestilence." Thus, the library seeks to exclude patrons based on generalized, unsubstantiated prejudices and fears rather than on its legitimate interest in quelling actual disturbances.

As the Court stated in *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), wherein the Court invalidated the poll tax:

> [T]he interest of the State, when it comes to voting, is limited to the power to fix qualifications. Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process. Lines drawn on the basis of wealth or property, like those of race,

are traditionally disfavored. To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor. [citations omitted].

The same can be said of the library policy, where the library's avowed practice is to eject patrons who do not have regular access to shower and laundry facilities. The "hygiene" test is not only irrelevant to serving library purposes; it conditions access to a public forum for First Amendment activity on what is at bottom an irrational and unreasonable wealth classification with a disparate impact on the poor. Accordingly, paragraphs 1 and 9 of the library policy violate the due process and equal protection clauses of the Fourteenth Amendment, in conjunction with the First Amendment guarantee of free assembly and association.

## V. The Library Policy Violates the New Jersey State Constitution

■ Article I of the New Jersey Constitution provides:

> Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press.... [par. 6.]

> The people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances. [par. 18.]

In *State v. Schmid,* 84 N.J. 535, 423 A.2d 615 (1980), the New Jersey Supreme Court invalidated on state constitutional grounds Princeton University's restriction of on-campus solicitations. Noting that the state constitutions may afford more protection of individual rights than the federal constitution, *id.* at 553–57, 423 A.2d 615, the Supreme Court extended free expression guarantees to speakers on private as well as public property. Under the foregoing state constitutional provisions, the Court imposed a "reasonableness" requirement on *private* restrictions which touch on the people's right to free expression.

We conclude, therefore, that the State Constitution furnishes to individuals the complementary freedoms of speech and assembly and protects the reasonable exercise of those rights. These guarantees extend directly to governmental entities as well as to persons exercising governmental powers. They are also available against unreasonably restrictive or oppressive conduct on the part of private entities that have otherwise assumed a constitutional obligation not to abridge the individual exercise of such freedoms because of the public use of their property. The State's Constitution in this fashion serves to thwart inhibitory actions which unreasonably frustrate, infringe, or obstruct the expressional and associational rights of individuals exercised under Article I, paragraphs 6 and 18 thereof.

*Id.* at 560, 423 A.2d 615. The *Schmid* court clearly required that a "reasonable" regulation turn on actual, material disruption. *Id.* at 566–67, 423 A.2d 615.

The court's discussion in part I, *supra,* in which the court found the library policy violative of the First Amendment, is equally applicable to plaintiff's challenge under the New Jersey State Constitution. Even under the lower threshold of "reasonableness" which New Jersey applies to private property, the library policy fails. The policy imposes unreasonable restrictions on access to the library, a place devoted to free expression and communication, because it excludes patrons for reasons unrelated to the ordered functions of a library. The paragraph 9 "smell test" is the most dramatic example of such unreasonable provisions; it conditions access based on patrons' personal attributes and/or identity rather than on clearly identified standards for disruption; the fact that some may find the patron "offensive" does not qualify as a disruption. *See supra,* parts II–IV.

The library policy violates the New Jersey State Constitution because it imposes unreasonable restrictions on citizens' free expression activities; specifically, it does not require that an actual or imminent disruption be threatened. The court does not find it necessary to reiterate all the previously stated reasons why the library policy imposes unreasonable restrictions on access to the library. However, the court does note that defendants' own citations to New Jersey law demonstrate that New Jersey law also requires an actual or imminent disturbance standard. Def. Brief at 11–12. *See, e.g., Camarco v. City of Orange,* 61 N.J. 463, 466, 295 A.2d 353 (1972) (upholding city ordinance proscribing loitering *"when it will* 'obstruct, molest, or interfere' with any person lawfully in a public place") (emphasis added).

At pages 9 through 10 of their moving brief, defendants rely on *Schmid* and on *Uston v. Resorts International Hotel, Inc.,* 89 N.J. 163, 445 A.2d 370 (1982), for the proposition, made in dictum, that "[i]n some circumstances, proprietors have a duty to remove disorderly or otherwise dangerous persons from the premises." (Quoting *Uston,* 89 N.J. at 173, 445 A.2d 370). But the actual holding of *Uston* supports the inverse proposition: that proprietors "have no right to exclude people unreasonably. On the contrary, they have a *duty* not to act in an arbitrary and discriminatory manner towards persons who come on their premises." *Uston,* 89 N.J. at 173, 445 A.2d 370. Thus, according to the passages from *Uston* which defendants cite, the library may "reasonably" exclude "disorderly and otherwise dangerous persons." The problem, of course, is that the library policy does not limit its restrictions to such persons. Instead, paragraph 1 excludes persons who sit quietly and peacefully, paragraph 9 excludes those with a smell which some unidentified person finds "offensive" for some unknown reason, and paragraph 5 excludes persons who some unidentified person finds "annoying" for some unknown reason. Thus, under New Jersey law as defendants themselves present it, the library policy is facially invalid. If defendants feel that certain behavior is dangerous and disruptive, they must craft an exclusion policy which specifically identifies such behavior.

*Conclusion*

For the foregoing reasons, the court concludes that paragraphs 1, 5, 9, and the last

two unnumbered paragraphs of the Morristown Library "Patron Policy" violate the First Amendment to the United States Constitution; these provisions are not narrowly tailored or reasonable time, place, and manner regulations which serve a significant government interest. In addition, paragraphs 1 and 5 of the library policy are unconstitutionally overbroad; paragraphs 1, 5, and 9 are unconstitutionally vague; and paragraphs 1, 5, and 9 violate the equal protection and due process clauses of the Fourteenth Amendment in conjunction with the free association guarantee of the First Amendment.

The court also concludes that paragraphs 1, 5, 9, and the last two unnumbered paragraphs of the policy violate the New Jersey Constitution.